Minnie WILLIS, (Plaintiff) Respondent,

v.

RIVERMINES I.G.A. SUPERMARKET, a Corporation, (Defendant) Appellant.

No. 30630.

St. Louis Court of Appeals.

Missouri.

Oct. 17, 1961.

Motion for Rehearing or for Transfer to Supreme Court Denied Nov. 15, 1961.

Dearing, Richeson & Weier, H. L. C. Weier, Hillsboro, for appellant.

McClintock & Medley, Charles W. Medley, Flat River, for respondent.

RUDDY, Judge.

This is an action for damages for personal injuries which plaintiff alleges she sustained when she was caused to fall on a parking lot owned and operated by defendant. Upon trial the jury found in favor of plaintiff and assessed her damages at the sum of $2,400. Defendant appeals.

Defendant's first contention is that plaintiff failed to prove that it was negligent. In support of this contention it claims that the depressed area where plaintiff fell was not an unknown or lurking hazard, but was obvious and had been there for some time and if any danger existed, it should have

been as well known to plaintiff as to defendant. This point, relied on by defendant, requires a summation of all the evidence favorable to plaintiff.

On April 3, 1959, about 10:30 A.M., plaintiff and her husband went to defendant's supermarket in Cantwell, Missouri, in their pickup truck. They had traded at this store a long time. Plaintiff's husband, who was driving, parked the truck on a parking lot owned and operated by defendant for its customers' use in parking automotive vehicles. He parked the truck approximately 15 or 20 feet west of the door to the store. The day was dry and clear. Plaintiff was wearing her glasses, which she said she needed in order to see where she was walking. She was wearing shoes with low heels. Plaintiff got out on the right side of the truck and walked to the store over the surface of the parking lot. The parking lot had been covered with a material described as a fill from the lead belt. This material had been crushed into one-half inch size and resembled rock. When asked if she watched where she was walking, she answered, "Yeah * * I just got out and walked in the store like anybody else would." At another place in her testimony when asked a similar question she answered, "Well, I never paid no attention." She said she saw a few low spots in the parking lot but saw none as big and deep as the one that caused her to fall. She never did see "that hole before."

Plaintiff entered the store through the door east of where the truck was parked. While in the store she purchased a 5 pound sack of corn meal, a 5 pound sack of flour, some salt bacon, onions and "other stuff." Having some dried beans at home, she was purchasing the remaining ingredients for her washday dinner, namely, "dried beans and salt bacon and corn bread," which seems like the makings of a meal having the potential of restoring the lost energy of any tired woman after a day of washing. All of the purchases made by plaintiff were placed in "a big brown sack." She said she held the sack of groceries in front of her on her left arm and had her "purse in the other arm." After she left the store she walked directly toward the truck. At a point about 4 feet in front of the truck she stepped "off in a low place" and a rock in the low place caused her to "roll." She said "I stepped on a rock and I rolled." Plaintiff fell on her right side and suffered a fracture of the greater tuberosity of the right humerus together with other injuries. Plaintiff said the hole in which she stepped was "ankle deep," about one and one-half or two feet in diameter, the sides of which were "sloping." Plaintiff's husband saw her fall and described the hole in which she fell as a foot and one-half in diameter. He said the hole had about two inches of chat in it and the top of the chat was two inches below the level of the surrounding terrain. He said the hole had a total depth of 4 inches and the sides were "sloping." The hole was in front of the truck and was not in the path his wife followed when she went into the store.

The effect of the testimony of four other witnesses for plaintiff was that the parking lot had some small indentations or holes upon it and had one hole a little larger, which was 12 to 15 feet west of the store and in the vicinity of where plaintiff fell. This hole was about "a foot and a half, maybe 2 feet round, * * * about a foot and a half wide," and was about 3 or 4 inches to 6 inches in depth. The sides of this large hole sloped towards its center. All of the witnesses had seen this large hole in the parking lot 2 or 3 months before plaintiff fell. None of these witnesses saw her fall. This hole remained on the parking lot until it was "black topped" sometime after plaintiff fell. One of the witnesses for plaintiff testified that while the hole could be seen "anybody can walk off in places like that." Another of plaintiff's witnesses, when describing the large hole in the area where plaintiff fell, said "there was a hole there that a person could slip and fall and could hurt themselves."

Lynn Landolt, General Manager of defendant's stores, called as a witness by defendant, testified that the holes in the parking lot would range from one foot to two feet in diameter and were 2 to 4 inches deep. He said the depth of the holes was "unnoticeable unless you were lookin' for 'em." He had seen these holes in the parking lot prior to April 3, 1959.

Arthur T. Morris, Manager of defendant's store at Cantwell, Missouri, testified to the existence of dips and indentations "all over the lot," some of which were a foot and one half in length and a foot in width. He admitted there could have been a hole 15 feet west of the store deeper than the others. In connection with this hole, he was asked, "And it was actually kind of hard to tell whether or not there was a hole there when it was dry, wasn't it?" and he answered, "I would think it would be just looking over the lot." He indicated this was true because the same type of surface was all over the lot.

The issue asserted by defendant's first contention presents nothing new insofar as principles of law are concerned. It is the application of the facts to the oft announced rule of law governing the duty of an invitor to an invitee that causes difficulties. Each case, requiring the application of the rule involved in this case, must be determined in the light of the facts of the particular case.

In Wilkins v. Allied Stores of Missouri, Mo., 308 S.W.2d 623, the court, in discussing the duty owed by the occupier of premises to his business invitee, pointed out that in Dean v. Safeway Stores, Inc., Mo., 300 S.W.2d 431, 432, the court said that the rule as declared and set forth in 2 Restatement Law of Torts is firmly imbedded in the jurisprudence of this state. The rule found in Sec. 343 in the Restatement Law of Torts is as follows:

"A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm * * *."

This rule, stated in different language but asserting the same duty of a possessor of land, has been followed in all of the cases cited by both plaintiff and defendant, some of which we cite: Vogt v. Wurmb, 318 Mo. 471, 300 S.W. 278; Paubel v. Hitz, 339 Mo. 274, 96 S.W.2d 369; Stoll v. First National Bank of Independence, 345 Mo. 582, 134 S.W.2d 97; Wilkins v. Allied Stores of Missouri, supra; Cameron v. Small, Mo., 182 S.W.2d 565.

It is agreed that plaintiff was a business visitor upon the parking lot of defendant at the time she fell. There is no doubt, after a reading of the evidence, that defendant knew of the existence of the hole causing plaintiff to fall and knew of the existence of other holes in the parking lot. Plaintiff's witnesses testified that the holes, including the one that caused plaintiff to fall, were on the lot two to three months. Lynn Landolt, General Manager of defendant's store, had seen these holes prior to the date of plaintiff's fall. Therefore, the evidence was such from which the jury could find that defendant knew, or by the exercise of reasonable care could have discovered, the hole that caused plaintiff's fall.

Also, we think the jury could have found that defendant, knowing of the hole should have realized that the existence of the hole created a danger to its customers,

for it knew, as its witnesses testified, that the depth of the holes was "unnoticeable unless you were lookin' for 'em" and knew what its manager of the Cantwell store knew, that it would be hard to tell that the hole was there when the lot was dry. He said this was so because the chat which was in the holes and covered the surface of the lot was the same and made the holes hard to see when you would be looking "over the lot." We infer from this testimony that the manager meant the color of the chat was the same in the holes and on the surface and this similarity in color made the holes hard to see. Defendant knew, or could have been reasonably expected to know, that some customers leaving its store and traversing the parking lot would be carrying large sacks of groceries and when carried in front by the customer would, to a substantial degree, obscure the forward vision of the customer. Defendant knew, or by the exercise of reasonable care could have known, that the hole was four to six inches deep and that the sides sloped toward the center. We held in Taylor v. Hitt, Mo. App., 342 S.W.2d 489, that evidence of the existence of a 15-inch square depression two to four inches deep in a basement floor, which depression sloped toward a six inch drain tile was sufficient to submit to the jury the question of whether or not the defendant could have reasonably anticipated injury to plaintiff by reason of the contour of the drain when used in the manner intended. We so held despite plaintiff's admission that she knew of the depression and that it was obvious to the eye.

We think the evidence was sufficient in the instant case from which a jury could find that defendant had reason to believe that the hole created a danger to its customers and that plaintiff would not discover the hole or realize the risk involved in walking over the lot.

■ Defendant strongly urges that the facts testified to by plaintiff and her witnesses indicate that the danger which might confront plaintiff in walking across the uneven surface of the parking lot was so open and obvious that the trial court should not have imposed any liability upon it and should have directed a verdict in its favor. In this connection defendant calls our attention to the testimony of plaintiff when she said that she had seen a few low spots in the parking lot and admitted she had traded with the store for a long time. Because of this testimony defendant contends that plaintiff cannot now be heard to say that she was unaware of the danger. Defendant also contends in this same connection that plaintiff's testimony shows that she was not paying any attention to where she was putting her feet. While plaintiff's testimony showed she was aware of a few low spots in the parking lot, her testimony also showed that she saw none as big and as deep as the one that caused her to fall, adding that she had never seen "that hole before." The manager of defendant's store at Cantwell, Missouri, admitted there could have been a hole 15 feet west of the store deeper than the others. It is true that at one place in her testimony plaintiff said that she paid no attention to where she was walking, but we think this testimony must be considered with her other testimony wherein she said that she did watch where she was walking, explaining that she walked into the store "like anybody else would." In the case of Long v. F. W. Woolworth Co., Mo., 159 S.W.2d 619, 624, the court, quoting from State ex rel. Elliott's Department Store Co. v. Haid et al., 330 Mo. 959, 965, 51 S.W.2d 1015, 1017, said:

> " 'It is true that the law requires a person to make ordinary use of his faculties to observe and avoid danger. But it is equally true that one is not required to look out for danger where there is no reason to apprehend any. It cannot be said, as a matter of law, that the plaintiff here, in the circumstances in which she was placed, was not making ordinary use of her facul-

ties—such use as an ordinarily prudent person would have made—at the time she fell.' "

In the instant case plaintiff did not know of this big hole. She had never seen it before. Her husband testified that she did not return to the truck over the same path she used when entering the store. We think the jury could have found that plaintiff did look in the manner of the ordinary person, as plaintiff said, "like anybody else would." We too must say that when consideration is given to the circumstances surrounding plaintiff, we cannot say, as a matter of law, that plaintiff in the respects complained of by defendant was not exercising the care of an ordinarily prudent person. The contention of defendant that plaintiff failed to prove that it was negligent must be overruled.

■ In the course of the trial Collene Lawson, a witness for defendant and an employee in its store, testified that she took care of plaintiff's grocery order on the day plaintiff fell and that plaintiff "bought a pound of beans and a package of green onions and some hog jowl" which the witness placed in a twenty pound bag. She said the items purchased by plaintiff would not weigh more than 3½ pounds. Witness testified further that plaintiff "came back to the store after she (plaintiff) went to the doctor" and that plaintiff told her the shoes she had on "she couldn't walk in 'em." Witness said plaintiff was wearing a pair of wedgies.

Plaintiff was called in rebuttal and testified that she purchased the items we summarized earlier in this opinion, which items were greater in number and weight than those testified to by Collene Lawson. Thereafter, the following questions were asked, answers given and objections made:

"Q. Now, Mrs. Willis, when was the next time you were in the store after that? A. Well, Mr. Medley, I didn't go back in the store for two,

three days after that because I walked the floor and screamed with my shoulder all evening that evening.

"By Mr. Weier: If the Court please, I want to object to that now; that's highly prejudicial and used merely to inflame the minds of the Jury and I'd like to ask the Jury be discharged on account of the prejudicial statements made by the witness.

"By the Court: The request is denied. Mrs. Willis, just answer the questions that are asked.

"By Mr. Medley: You were not back in the store for two, three days? A. No, I sure wasn't, no, sir.

"Q. Did you ever tell Mrs. Lawson that you fell because you couldn't stand up on your shoes or anything of that nature? A. No. If God would strike me dead in this chair I didn't tell her that.

"By the Court: Now, wait, wait, lady, if you please. Just answer the question, please.

"By Mr. Weier: I want to object to the outburst of the witness from the witness stand with the excessive emotion displayed by the witness and ask the Jury be discharged because of the prejudicial effect that it may have upon the minds of the Jury.

"By the Court: The request will be denied. Now, Mrs. Willis, I must caution you again now, merely answer the questions asked, no more than that."

Addressing our remarks to the testimony of plaintiff that forms the basis of defendant's first objection and request for a discharge of the jury, we think the trial court was in better position to determine whether or not the statement complained of was prejudicial. In justification of the court's action it should be pointed out that this rebuttal testimony was the result of an attack on plaintiff's veracity, and was oc-

casioned by the testimony of defendant's witness, Collene Lawson, who testified that plaintiff came back to the store after she went to the doctor. This could be understood to mean that plaintiff returned to the store the day she fell. Plaintiff's rebuttal testimony was a denial of defendant's evidence in this regard and an explanation of why she could not have returned to the store on the day she fell.

What we have said concerning the first objection and request for a discharge of the jury is applicable to defendant's next request for a discharge of the jury. The testimony of plaintiff which formed the basis of defendant's request was a strong effort on plaintiff's part to preserve the integrity of her contention that she had not returned to the store the day she fell and that she did not tell Collene Lawson she could not walk in the shoes she was wearing the day she fell. It might have been better for plaintiff to refute Collene Lawson's testimony in less emphatic language, but we agree with the trial judge that it is unlikely this testimony prejudiced the jury against defendant.

■ In the course of the cross examination of plaintiff, following her direct examination, she was asked if she remembered signing a statement in connection with what happened at the time of her fall. She admitted signing the statement but denied that she made some of the answers that were placed in the statement by the scrivener. It is apparent from the record the statement was taken by a representative of the defendant. In her rebuttal testimony she was asked to describe "the man that came down to take this statement" and she answered, "He was a little short—I guess he was—he looked like a little Jewish fellow." Thereafter, defendant's counsel objected to plaintiff's answer and asked the court to instruct the jury to disregard it. The court complied with this request. Defendant's counsel further moved that the jury be discharged. This request was denied by the court. Denial of same is now charged by defendant as error.

Defendant characterizes plaintiff's answer as an effort to inject a religious issue entirely foreign to the issues before the jury. We do not so characterize the remark. We feel it was an effort upon the part of plaintiff to describe the person and was used simply as a descriptive term. As pointed out in plaintiff's brief, she may very well have said he was a little Irishman or a big Swede, with no intention of injecting either religious or racial prejudice. No bad faith is evident in the use of this description. We think the court's action in denying the request for a discharge of the jury was correct.

Defendant complains about portions of the closing argument of plaintiff's attorney. In the course of his argument plaintiff's attorney told the jury: "Mrs. Willis is a poor woman. She has to do her own washing. She has to do her own mopping or have her husband do it." There followed an objection by defendant's attorney to the statement that Mrs. Willis is a poor woman. The objection was followed by a withdrawal of the statement by plaintiff's attorney. Thereupon, defendant's attorney asked the court to discharge the jury. This request was denied. There was no request that the jury be instructed to disregard the statement made and no request that plaintiff's attorney be reprimanded. We think this complaint of defendant should be considered with another complaint made by defendant concerning the closing argument of plaintiff's attorney.

■ After telling the jury that plaintiff was " * * * not going to hire a maid or she hasn't hired a maid to come in to clean her house. She just has to get it done the best way she can and she can't do it herself. How much is she entitled to for not being able to mop her floor, not being able to completely dress herself, not being able to properly do her washing and other housework lifting pots

and pans, how much is it worth?" Plaintiff's attorney then told the jury that plaintiff was going to have trouble for eighteen years taking care of the duties he enumerated. Plaintiff's attorney then followed with this argument, of which defendant now complains: "I believe if you will figure up eighteen years at three hundred sixty-five days per year it comes out six thousand five hundred and seventy days and we believe that this lady should be entitled to two dollars per day for this injury. We don't think that that is asking too much. If you think two dollars a day is too much figure up in your own mind what you think would be a proper amount and whatever you bring in, if you feel it's proper, I'm sure that Mrs. Willis will feel it's proper. * * *" Defendant's attorney objected "to the argument of counsel with regard to two dollars per day for the number of days that he has figured here as being inflammatory and improper and contrary to the law * * *." This objection was followed with a request for discharge of the jury. The request was denied.

The medical evidence showed that plaintiff suffered an avulsion type of fracture of the greater tuberosity of the right humerus with a 20% loss of function of the right arm which was described as being permanent. Other evidence showed plaintiff's life expectancy to be 17.92 years.

We shall first address our discussion to that part of the argument complained of where the jury was told that plaintiff should be entitled to $2.00 per day because of her decreased ability to take care of certain duties due to her injury. Defendant contends this calls on the jury to use a mathematical formula to arrive at its verdict and that such an appeal has been condemned by the courts of this state, citing the case of Faught v. Washam, Mo., 329 S.W.2d 588. The mathematical formula condemned in the case cited by defendant called upon the jury to employ such a formula in assessing plaintiff's damages for pain and suffering. The jurors were asked to put themselves in plaintiff's place in assessing his damages for pain and suffering. That is not what the jury was asked to employ or do in this case. In the Faught case, supra, the court said that an appeal, such as was made to the jurors in that case, standing alone, does not always constitute reversible error where there is no complaint on appeal that the verdict was excessive. In the instant appeal defendant presents no point contending that the verdict was excessive. This part of the argument, complained of by defendant, could have affected the issue of damages only and if we assume the court erred in its ruling it was harmless. Anderson v. Bell, Mo., 303 S.W.2d 93, 100, and Millard v. St. Louis Public Service Company, Mo.App., 330 S.W.2d 147, 155. However, such a point would be ineffective, if relied on, because we think the amount awarded as damages was modest. Also, the amount awarded by the jury is a clear indication that the jury was not prejudiced by the statement of plaintiff's attorney which forms the basis of defendant's complaint.

The statement by plaintiff's attorney that plaintiff "is a poor woman," was unfortunate, but we do not think it was intended as an appeal to the jury to find in favor of the plaintiff because of her lack of worldly goods. This becomes more evident when we consider the argument that followed which pointed to plaintiff's inability to do her house chores and to the possible need of getting "it done the best way she can." We do not mean to approve what was said in this portion of the argument, but we do not believe it was prejudicial. We are not permitted to reverse a judgment, unless we believe that error was committed by the trial court against defendant, materially affecting the merits of the case. V.A.M.R. Civil Rule 83.13(b).

Supplementing what we have said in answer to defendant's complaints about portions of the closing argument made by

plaintiff's attorney, we repeat what we said in the case of Rohlfing v. State Farm Fire and Casualty Co. et al., 349 S.W.2d 472, 478:

"It is only in unusual cases that the court is justified in resorting to the drastic remedy of discharging the jury on account of improper argument. (Citing case.) We said in Shelley v. St. Louis Public Service Company, Mo.App., 279 S.W.2d 182, loc. cit. 187: 'The rule is firmly established in Missouri that the trial judge, who has the opportunity of hearing the lawyer present his client's cause to the jury, is vested with wide discretion in ruling on the propriety of the argument with respect to the question of prejudice, and unless it appears that the trial judge has clearly abused his discretion, we should defer to his judgment. (Citing cases.)'"

We do not think the trial judge in the instant case abused his discretion in the matters complained of by defendant.

■ In the final point relied on by defendant it contends that the court erred in giving Instruction No. 1 at the request of plaintiff. In this connection defendant asserts two points, both of which are essentially the same. It contends that the instruction fails to set out that before the jury could find defendant liable, it must also find that plaintiff did not know, or in the exercise of ordinary care would not have known of the hole in the parking lot where she fell. In answering this contention, it should be observed that plaintiff's theory of recovery was defendant's failure to repair a dangerous and unsafe condition, which it knew or should have known existed. We think it is a sufficient answer to defendant's contention to point out that plaintiff's instruction, after hypothesizing the facts from which the jury could find that plaintiff was negligent in not exercising ordinary care to keep its parking lot in a reasonably safe condition for use by its customers, further required the jury to find, before it could find in favor of plaintiff, that plaintiff was not contributorily negligent as submitted in other instructions. Instruction No. 3 told the jury that if plaintiff saw, or in the exercise of ordinary care could have seen the hole in the parking lot, and that by stepping therein, she failed to exercise the care and caution which an ordinarily prudent person would have exercised under the circumstances at the said time and place and that her failure to exercise such care contributed to cause her to fall, then the jury was instructed to find for the defendant. We think this instruction sufficiently submits to the jury the issue of whether plaintiff exercised ordinary care in discovering and knowing of the existence of the hole.

In the case of Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, loc. cit. 500, the court, in reaching a conclusion as to a general rule applicable to verdict-directing instructions in negligence cases, said inter alia: " * * * then a verdict-directing instruction or instructions given in his (plaintiff's) behalf should hypothesize, either by recital *or by reference to other instructions,* the facts essential in law to support the verdict." (Parenthesis and emphasis ours.)

We think Instruction No. 1 incorporated by reference the issue of whether or not plaintiff knew of the existence of the hole, or by the exercise of ordinary care could have discovered and seen the hole. When the instructions are considered in their entirety and as a whole, we think the required issues to be determind by the jury were adequately submitted.

Finding no error the judgment of the trial court is affirmed.

ANDERSON, P. J., and WOLFE, J., concur.